442 F.2d 1261
 CONSOLIDATION COAL COMPANY, a corporation, Appellee,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellants.
CONSOLIDATION COAL COMPANY, a corporation, Appellant,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
UNITED STATES STEEL CORPORATION, a corporation, Appellant,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
YOUNGSTOWN MINES CORPORATION, a corporation, Appellant,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
EASTERN ASSOCIATED COAL CORPORATION, and Sterling Smokeless Coal Company, corporations, Appellants,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
OLGA COAL COMPANY, a corporation, Appellant,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
RANGER FUEL CORPORATION, a corporation, Appellant,
v.
DISABLED MINERS OF SOUTHERN WEST VIRGINIA, etc., et al., Appellees.
Elmer BROWN et al., Appellants,
v.
CONSOLIDATION COAL COMPANY et al., Appellees.
 No. 15173.
 No. 15396-15402.
 United States Court of Appeals, Fourth Circuit.
 Argued April 7, 1971.
 Decided May 12, 1971.
 
 Herbert J. Rogers, Wheeling, W. Va., and Kenneth J. Yablonski, Washington, Pa. (Donald L. Pitts and Clarice Fieldman, Washington, D. C., on the brief), for appellants in No. 15173.
 Harold R. Schmidt, Pittsburgh, Pa. (Karl Alexander and Rose, Schmidt & Dixon, Pittsburgh, Pa., on the brief), for appellee in No. 15173.
 Charles A. Tutwiler, Welch, W. Va., Russell L. Furbee, Fairmont, W. Va., Harold R. Schmidt, Pittsburgh, Pa. and Charles M. Love, Charleston, W. Va. (Crockett, Tutwiler & Crockett, Welch, W. Va., Furbee, Amos, Webb & Critchfield, Fairmont, W. Va., Karl Alexander and Rose, Schmidt & Dixon, Pittsburgh, Pa., Campbell, Love, Woodroe & Kizer, Charleston, W. Va., and Thomas B. Miller, Schmidt, Laas, Schrader & Miller, Wheeling W. Va., on the brief), for appellants in Nos. 15396 through 15401 and for appellees in No. 15402.
 Ray E. Ratliffe, Jr. for appellees in Nos. 15396 through 15401.
 Richard M. Bank, Beckley, W. Va. (Naomi W. Cohen, Charleston, W. Va., Harvey M. Cohen, Huntington, W. Va., and Joseph F. Flynn, Heidrick, Ky., on the brief), for appellants in No. 15402.
 Before WINTER, CRAVEN and BUTZNER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 These consolidated appeals arise from litigation instituted when disabled miners and their dependents picketed, and threatened to picket, plaintiffs' bituminous coal mines in the Northern and Southern Districts of West Virginia. Preliminary injunctions to enjoin picketing were entered in both district courts. The disabled miners and their dependents had resorted to this form of selfhelp to redress their alleged grievances against the trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950 (the "Fund"). The Fund was established by collective bargaining, under the authority of § 302 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 186, to receive royalties from the mine owners on coal mined and to establish and administer a program of benefits for the miners and their dependents. In essence, the disabled miners and their dependents claim that they have been denied benefits to which they are, or ought to be, entitled.
 
 
 2
 In No. 15,173 (from the Northern District of West Virginia) and in No. 15,402 (from the Southern District of West Virginia), the disabled miners and their dependents appeal from the entry of preliminary injunctions enjoining picketing. In Nos. 15,396-15,401 (from the Southern District of West Virginia), the plaintiffs, mine owners, appeal from the dismissal, as a party defendant, of the Association of Disabled Miners and Widows, Inc. (the "Association") in their several suits to enjoin actual and threatened picketing. The dismissal was granted on the ground that the Association had not been properly served.
 
 
 3
 We affirm the preliminary injunction entered in the Southern District of West Virginia appeals, although we will require it to be modified. We reverse the dismissal of the Association as a party defendant in the Southern District of West Virginia cases. We vacate the preliminary injunction in the Northern District of West Virginia cases on the grounds of procedural irregularities. We remand all cases to the respective district courts in which they originated for further proceedings and final determination.
 
 
 4
 - I -
 
 
 5
 The facts from which the legal issues are derived may be briefly stated. The Fund is administered by three trustees — one who is a representative of the coal companies (employers), one who is a representative of the union (United Mine Workers of America), and the third a neutral party selected by the other two. The Fund receives from the mine owners a royalty of forty cents per ton for each ton of coal mined. In accordance with the contract and the Act, the royalties received are used to make payments, from principal or income, or both, of (1) benefits to employees, their families and dependents, for medical care, pensions or retirement or death, and compensation for injuries or illness (or insurance to provide such compensation), (2) benefits for wage losses not compensated for by state or federal law, (3) benefits for sickness, temporary or permanent disability, death or retirement, and (4) other benefits as may be agreed upon, from time to time, by the trustees. The establishment of precise benefits and their administration are matters committed to the authority of the trustees. In the administration of existing benefits and in the establishment of new benefits, the disabled miners and their dependents claim that they have received unfair and unequal treatment.
 
 
 6
 The mine operators are engaged in mining bituminous coal for sale and shipment in interstate commerce to customers who use the coal principally to generate electricity and to produce steel. Over thirty million tons of coal are mined a year and thousands of coal miners are employed.
 
 
 7
 The disabled miners and their dependents have no direct grievance with the coal operators or with the union. What they seek is a more liberal administration of the benefits currently established under the Fund and/or the establishment of new benefits. To accomplish this purpose, the disabled miners and their dependents have relied on what is asserted to be a well-established tradition among members of the United Mine Workers of America that a coal miner will not cross a picket line, irrespective of the objective of the picketing. Thus, from June 21 to June 24, 1970, the disabled miners and their dependents picketed coal mines in the Southern District of West Virginia and succeeded in shutting down the mines for that period. The theory of the disabled miners and their dependents was that if they exerted economic pressure on the mine operators and the union, the operators and the union would exert pressure on the trustees of the Fund, designated by them, to establish the benefits sought. For a period after June 24 picketing was discontinued, in part because the annual vacation period in the industry ensued, but then it was resumed in July, when the mine owners each instituted suit and obtained a temporary restraining order. Later the cases were consolidated and a preliminary injunction granted.
 
 
 8
 On or about August 10, it became known that the disabled miners and their dependents planned to carry their work interference to miners located in the Northern District of West Virginia. Picketing actually resulted at two mines in that district, and there was a threat that picketing would be extended to other mines. In the Northern District, two of the mine owners also instituted suit and obtained a temporary restraining order against picketing. The temporary restraining order was obtained on August 14 and expired on August 24; and, on the latter date, that order was extended until September 3. A hearing on an application for a preliminary injunction began on the afternoon of September 3, and, when it became obvious that it could not be completed prior to the expiration hour of the order, the district judge, on his own motion, extended the order for an additional ten days, issued a preliminary injunction and set the matter for further hearing for September 8. Before September 8, however, the district judge suffered an accidental injury and the hearing on September 8 could not be held. Thereafter, the disabled miners appealed and no further proceedings on the merits have been conducted. The preliminary injunction has continued.
 
 
 9
 - II -
 
 
 10
 Very recently we decided West Virginia Highlands Conservancy v. Island Creek Coal Company, 441 F.2d 232 (4 Cir., 1971), which restated the principles governing the grant of preliminary injunctions by district courts and the scope of review on appeal. These principles control here.
 
 
 11
 With regard to scope of review, we stated "[t]he decision to grant a preliminary injunction is discretionary with the district judge and may not be set aside on appeal unless an abuse of discretion is shown." With regard to when a district judge may grant a preliminary injunction, we will repeat what we said in the Conservancy case. There, the Conservancy sought and obtained a preliminary injunction to restrain a forest supervisor (Dorrell) from granting a permit to engage in logging in a wilderness area. We said (441 F.2d at 235):
 
 
 12
 it is not necessary that Conservancy demonstrate an absolute right to the relief it seeks in order to sustain the issuance of this preliminary injunction; it need establish only "probable right". It is apparent that Conservancy has raised substantial issues concerning the application of recent federal conservationist legislation to the administration of the National Forest system. Such issues are of great current public concern. They should be fully developed and litigated at the trial level in order to insure their proper resolution. It is at that stage that the various defenses raised by Dorrell should be asserted. While we express no opinion on these questions on their merits, we can say that their resolution is not immediately apparent. That is enough to say that Conservancy has not embarked on frivolous litigation, and thus interlocutory relief is not improper if Conservancy can also show a need for protection which outweighs any probable injury to Dorrell. (emphasis supplied.)
 
 
 13
 We also held that the public interest in the effect of the dispute must be taken into account in any determination of whether to grant injunctive relief. 232 F.2d at 441.
 
 
 14
 - III -
 
 
 15
 In the cases at bar, plaintiffs have shown a reasonable likelihood that they will prevail on the merits of the litigation.
 
 
 16
 The former employees and their dependents argue strenuously and exhaustively that the preliminary injunction violated the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., because the parties are engaged in a labor dispute and the type of self-help employed may not be enjoined under 29 U.S.C.A. § 104. They contend that even if their concerted action does have the effect of substantial disruption of interstate commerce in bituminous coal, those actions are exempted from the antitrust laws by the labor exemption in the Clayton Act, 15 U.S.C.A. § 17; 29 U.S.C.A. § 52. They claim that their right to engage in peaceful picketing is protected by the First Amendment and, therefore, the effect of the preliminary injunctions is to deny them their First Amendment rights. Finally, they argue that their activities do not constitute a tortious interference with the contractual relation between the coal operators and their employees under applicable state law.
 
 
 17
 To the contrary, plaintiffs assert as vigorously that the Norris-LaGuardia Act is inapplicable because there is not a "labor dispute" between the parties under the special circumstances where only the trustees of the Fund, whom plaintiffs assert are independent fiduciaries, can grant the relief the disabled miners seek and where the disabled miners and their dependents are not employees of the coal operators. These same special circumstances, it is also argued, render inapplicable the labor exemptions of the Clayton Act. With regard to the First Amendment, plaintiffs argue that the right to picket is not absolute, that the picketing was neither peaceful nor informational and that the purpose of the picketing was unlawful, i. e., to "turn off the lights" in the country by cutting off the supply of coal to electrical generating plants. Finally, plaintiffs contend that they showed prima facie a combination or conspiracy in violation of the Sherman Act, 15 U.S.C.A. § 1 et seq., and, under state law, a tortious interference with the contractual relationship between plaintiffs and their employees.
 
 
 18
 The district judge of the Southern District of West Virginia did not finally decide these legal questions; nor do we. He concluded only that there was at least a "reasonable likelihood * * * that the plaintiffs will succeed at the final hearing on the merits of the cases." We agree. But, because we do not finally decide these issues and because a full record has not been made, we will not discuss in detail the authorities and legal theories which support this conclusion. It suffices to say that whether there is a labor dispute between the parties — a question upon which application of the Norris-LaGuardia Act and the labor exception in the Clayton Act largely depend — would seem to turn upon the factual determination of whether the employer-employee trustees of the Fund are independent fiduciaries or whether they are representatives of the groups which designate them and whether they are amenable to pressures from the designating group. Neither the Act nor the agreement under which the Fund was established indicate that the trustees of the Fund are, or ought to be, merely conduits for articulation of the views of the persons who designated them as trustees, and there was some evidence in the Southern District cases that they are not. If the Fund is in fact insulated from the normal forces of industrial disputes, as the Act permitting such funds apparently contemplates, then disputes concerning them may be enjoinable despite the Norris-LaGuardia Act. This view is supported by the rationale of Boys Market v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), in which the Supreme Court held that a federal district court could properly enjoin a union from striking where the strike violated a no-strike clause and an agreement to submit disputes to arbitration. See generally, Note, The Supreme Court 1969 Term, 84 Harv.L.Rev. 30, 200 (1970). However, we reserve decision on the precise scope of the exception established by Boys Market pending further development of the facts in this case.
 
 
 19
 Similarly, there have been cases recognizing exceptions to the labor exemptions from the antitrust laws where job action is taken in pursuit of goals not normally considered labor goals. See, e. g., United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965); Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921). Although this line of cases has been severely restricted, see e. g., Local Union No. 189, Amalgamated Meat Cutters, v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), it may be that plaintiffs can establish that the present case is not exempt. If they cannot, an injunction still may be supportable under state tort law. As to the issue of free speech, we note that the imminent danger of infringement of a highly significant state interest — the continued operation of large parts of the West Virginia coal industry — has been alleged. It may be sufficient to overcome what is otherwise protected by the First Amendment.
 
 
 20
 We do not decide these issues now. Final resolution of them will require more extensive factual inquiry. Indeed, the district courts should give consideration to joining the Fund and the trustees as proper parties to the litigation to facilitate that inquiry if jurisdiction can be obtained over them. We conclude only that plaintiffs have demonstrated at least probable right to injunctive relief on the present record.
 
 
 21
 - IV -
 
 
 22
 Similarly, we conclude plaintiffs have shown a need for protection which, when considered together with the interests of the public, outweighs any probable injury to the defendants. We recognize that the disabled miners and their dependents may suffer greatly if their cause is just and they are being deprived of benefits to which they are entitled, but we agree with the district judge in the Southern District cases that "[t]he plaintiffs and general public will suffer greater injury by denial of a preliminary injunction than will the defendants and other members of the designated class and others acting in concert with them by the granting of a preliminary injunction." State relief and social security payments may mitigate some hardship, but we agree that against the interests of the disabled miners, must be balanced the interests of a far larger number of persons and institutions in the continued functioning of large parts of the coal mining industry in West Virginia. Believing that this latter interest is the greater, we conclude that there was no abuse of discretion in the granting of the preliminary injunction in the Southern District cases and that, in the main, the decree should be affirmed.
 
 - V -
 
 23
 Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends. Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted.
 
 
 24
 In the Southern District cases, the record clearly supports the finding that picketing, with the effect of closing the mines, took place. There was also some evidence that sporadic acts of violence were perpetrated although the district judge made no finding as to this. The injunctive order restrained "[p]icketing or in any other manner interfering with the orderly resumption of, or continuation of, operations at any mine in whole or in part owned and/or operated by any of the respective plaintiffs * * *" (emphasis added.) But the order went further. It restrained the disabled miners and their dependents and others acting in concert from "[c]oercing or otherwise inducing" plaintiffs' employees to withhold their services from any of the plaintiffs or at any of the plaintiffs' mines. (emphasis added.)
 
 
 25
 In the "any other manner" and the "inducing" phrases, we think the order too broad. If the district judge was persuaded by the proffered evidence of use of force and violence, it would have been proper for him to enjoin "interference by force or violence" or "inducing by force or violence, etc." But without this qualification, the "any other manner" category and the verb "inducing" would include pure expressions of opinion and thus infringe upon the exercise of First Amendment rights which did not seek to capitalize upon the asserted principle that no coal miner will cross any picket line irrespective of the object of picketing. The disabled miners and their dependents should not be restrained from publicizing their alleged grievances, short of picketing or employing force or violence to achieve their goals.
 
 
 26
 We will vacate these portions of the injunction and remand the case for further consideration, including the entry of a properly restricted order, in accordance with these views.
 
 
 27
 - VI -
 
 
 28
 When plaintiffs instituted their suits in the Southern District of West Virginia they named, inter alia, the Association as a party defendant. In addidition to being a named defendant, the Association can be said to have been sued also as a member of a class of persons acting in concert with other named individual defendants for the achievement of the same objectives. Service of a temporary restraining order issued July 9, 1970, was purportedly made upon the Association, but personal service strictly in accordance with the federal rules and the West Virginia statutes was not immediately obtained. On July 16, 1970, the Association moved to be dismissed from the proceedings because of lack of service of process and to quash the purported service of the temporary restraining order. Before the district judge ruled on this motion plaintiffs effected service of process on the Association in accordance with Rule 4 (d) (7), F.R.Civ.P., and West Virginia Code, Chapter 31, Article 1, § 71 (Michle Supp.1971), which the rule makes applicable. Nonetheless, in ruling upon the motion, the district judge considered that he was bound to decide whether service had been made as of July 16, 1970. He concluded that service was defective insofar as the Association had been sued individually, and, on July 23, 1970, he dismissed it from the cases as a named defendant. He reserved the question of whether it should be retained as a defendant as a member of the class; and, after taking some evidence, he dismissed it in that capacity also by an order entered August 11, 1970. His later ruling was apparently predicated upon his acceptance of testimony that the Association had sought to discourage its individual members who were named defendants from engaging in the picketing and other activities which the plaintiffs contended were illegal. Although the Association was dismissed from the proceedings in both capacities in which it had been sued, the dismissal order of August 11 stated that it was without prejudice to the plaintiffs' right to rejoin the Association, "either individually and/or as a member of any class should further pretrial discovery and/or the development of evidence otherwise justify such joinder * * *"
 
 
 29
 We think the dismissals were in error. Whatever deficiencies there may have been in service of process prior to July 21, 1970, it seems clear that service upon the Association as a named defendant was properly accomplished on that date. Rule 4(d) (7) permits service "in the manner prescribed by the law of the state in which the district court is held," and service on the West Virginia State Auditor's office was made in accordance with the provisions of the West Virginia Code. It may well be that the proof of the Association's participation in the picketing which was enjoined was insufficient to convince the district judge that the Association should be included within the scope of the injunction, but that objection can be readily met by excluding the Association from the operation of the preliminary injunction. There was some evidence of participation by an officer and some members of the Association in organizing the picketing, and there was proof of disclaimer by the Association that it sponsored the strike. Manifestly, there is a potential factual dispute which will require resolution, but, from the standpoint of the sufficiency of technical service and the desirability of retaining the Association as a party for purpose of pretrial discovery to facilitate ultimate resolution of the dispute, we conclude that the Association, while it need not be enjoined, should not have been dismissed. We will reverse the orders of dismissal without intimating any opinion on whether the Association is a party against which preliminary or permanent relief should be granted.
 
 
 30
 - VII -
 
 
 31
 In our view, the preliminary injunction entered in the Northern District of West Virginia must be vacated for noncompliance with Rule 65, F.R.Civ.P. To set forth the basis of our decision, it is necessary to elaborate on what actually transpired.
 
 
 32
 The temporary restraining order of August 14 was obtained ex parte on the basis of a verified complaint, supplemented by affidavits. By its terms, it expired at 5:00 P.M. on August 24. The complaint contained a prayer for a preliminary injunction, and a hearing thereon was set for August 24 at 4:00 P.M.
 
 
 33
 At the hearing on August 24, there were present counsel for the parties and a number of witnesses. The hearing did not result in the taking of any testimony, however. Rather, there was a discussion between counsel and the court to the effect that the litigation in the Northern District of West Virginia was ancillary to that previously filed and pending in the Southern District of West Virginia. Indeed, the findings and conclusions of the Southern District were specifically considered. Mindful that the August 14 temporary restraining order would expire at 5:00 P.M. on August 24, the district judge, without hearing a single witness or receiving any additional evidence, simply concluded to extend the temporary restraining order until 5:00 P.M. on September 3. He entered an order to that effect and set the matter for hearing on September 3 at 1:30 P.M.
 
 
 34
 On September 3 at 1:00 P.M., the next hearing began. In attendance were counsel for the parties and a number of witnesses. The testimony of a single witness, the vice president of operations for one of the plaintiffs, was taken. He was permitted to testify, over objection, that when he was in the vicinity of a mine in the Southern District of West Virginia, he had a conversation with men who were acting in connection with the disabled miners and they stated that they were there to shut down the mine. The witness was permitted to identify a document purporting to show the tonnage of coal lost by picketing in the Southern District of West Virginia, and he testified to the total production of coal of his employer's mines moving in interstate commerce. On cross-examination he admitted that he had no familiarity with any work stoppage in the Northern District of West Virginia, except what he read in the newspapers.
 
 
 35
 After receipt of this testimony and some colloquy with counsel, the district judge noted that the temporary restraining order as extended would expire in one hour and ten minutes. The court called attention to the discussion in 7 Moore's Federal Practice, ¶ 65.07, p. 1648, where Professor Moore suggests that if it is impractical or impossible to conclude a hearing and render a decision on an application for preliminary injunction before a temporary restraining order expires, the court should have authority to extend the temporary restraining order beyond twenty days, notwithstanding the contrary rule laid down in Sims v. Greene, 161 F.2d 87 (3 Cir. 1947). Accordingly, the district judge extended the temporary restraining order until September 13. At the same time, he granted a preliminary injunction similar in scope to that in the Southern District, but set down the matter for a further hearing on September 8, a hearing which was not held because of the district judge's intervening accident.
 
 
 36
 It is the orders of September 3 that are appealed from here. The temporary restraining order has expired, so the only issue before us is the validity of the preliminary injunction. The disabled miners and their dependents filed their notice of appeal on September 8, and the district judge retired the cases from the active docket, so that the preliminary injunction has continued to the present date.
 
 
 37
 The district judge made no specific findings to support his grant of preliminary injunction, but he did state that he thought the evidence was sufficient to indicate that plaintiffs' employees rendered services regularly as miners at plaintiffs' mines, but that the defendants were able to interrupt the work. The interruption occurred, so he said, prior to August 14 — the date on which the first suit was filed in the Northern District of West Virginia — and the district judge added that since then, there had not been, to his knowledge, any wrongful conduct.
 
 
 38
 Repeatedly throughout the various stages of the proceedings, defendants moved, both orally and by formal motion, to dissolve the temporary restraining order. There is no suggestion in the record that they ever consented to the temporary restraining order, the extension thereof, or to a preliminary injunction.
 
 
 39
 As we view the record, we can only conclude that for practical purposes plaintiffs obtained an ex parte preliminary injunction in a case in which there were sharply disputed questions of fact and of law. This was manifestly error, because Rule 65(a) (1) is explicit that "[n]o preliminary injunction shall be issued without notice to the adverse party;" and, as stated in Sims v. Greene, 161 F.2d 87, 88-89 (3 Cir. 1947):
 
 
 40
 Notice implies an opportunity to be heard. Hearing requires trial of an issue or issues of fact. Trial of an issue of fact necessitates opportunity to present evidence and not by only one side to the controversy. It should be pointed out also that subsection (b) of Rule 65 provides that a motion for a preliminary injunction "shall be set down for a hearing * * *" and speaks of the motion coming on for hearing." * * * The conclusion is inescapable that since a district court is required by the rule to make findings of fact, the findings must be based on something more than a one-sided presentation of the evidence. (footnotes eliminated.)
 
 
 41
 Accord, Detroit & T. S. L. R. Co. v. Brotherhood of Locomotive Firemen, 357 F.2d 152 (6 Cir. 1966); Hawkins v. Board of Control of Florida, 253 F.2d 752 (5 Cir. 1958) (per curiam); 3 Barron & Holtzoff, Federal Practice and Procedure § 1433 (Wright ed. 1958). But see, San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541 (9 Cir. 1969).
 
 
 42
 Specifically, the district judge should have given the parties sufficient time to present their proofs. He should have made findings of fact and stated conclusions of law to support the issuance of a preliminary injunction if he concluded that the injunction should issue. Rule 52(a), F.R.Civ.P. We are unpersuaded by plaintiffs' argument, initially suggested by the district judge, that somehow the stringent requirements of Rule 65 can be circumvented on the theory that the litigation in the Northern District was "ancillary" to that pending in the Southern District. The fact is that while there was some identity of plaintiffs in the lawsuits in the two districts, there was not an identity of defendants nor was there any identity of mines at which allegedly unlawful picketing had occurred. It was, therefore, decidedly improper to issue a preliminary injunction without strict compliance with Rule 65. Diligence in following the requirements of the Rule is particularly important in preliminary injunction cases because the persons enjoined must obey the order, and can be punished for violating it, despite irregularities in the procedure by which it was obtained. United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).
 
 
 43
 We, therefore, vacate the preliminary injunction entered in the Northern District of West Virginia. We do so, however, without prejudice to a renewal of the motions therefor and the proper grant of relief in a proceeding where the requirements of Rule 65 are met.
 
 
 44
 No. 15173: Vacated and remanded.
 
 
 45
 Nos. 15396-15401: Reversed and remanded.
 
 
 46
 No. 15402: Modified and affirmed.